Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Kristine Akland
AKLAND LAW FIRM, PLLC
PO Box 7274
Missoula, MT 59807
(406) 544-9863
aklandlawfirm@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL. <br><br>       Plaintiffs, <br><br> vs. <br><br> LEANNE MARTEN, Regional Forester of Region One of the U.S. Forest Service, and UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, <br><br><br>       Defendants. | CV- <br><br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

# I. INTRODUCTION

1.  This is a civil action for judicial review under the citizen suit provision of the Administrative Procedure Act of the U.S. Forest Service's (Forest Service) authorizations, analyses, and lack thereof on the Helena-Lewis and Clark National Forest (Forest) related to and regarding the Stonewall Vegetation Project (Project) and Forest Plan Amendment #31.

2.  Plaintiffs Native Ecosystems Council and Alliance for the Wild Rockies attest that the decisions approving the challenged authorizations, analyses, and lack thereof are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3.  Defendants' actions or omissions violate the National Environmental Policy Act (NEPA), 42 U.S.C. 4331 *et seq.*, the National Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*

4.  Plaintiffs request that the Court set aside the Project and Forest Plan Amendment pursuant to 5 U.S.C. § 706(2)(A) and enjoin implementation of the Project.

5.  Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and such other relief as

this Court deems just and proper.

## II.  JURISDICTION

6.   This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

7.   An actual controversy exists between Plaintiffs and Defendants.  Plaintiffs' members use and enjoy the Helena-Lewis and Clark National Forest for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

8.   The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably injured if Defendants implement the Project.  These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NFMA, NEPA, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706.

9.   Plaintiffs submitted timely written comments and objections concerning the

Project and Forest Plan Amendment in the available administrative review process, thus they have exhausted administrative remedies.  Therefore, the Court has jurisdiction to review Plaintiffs' APA claims.

### III. VENUE

10.   Venue in this case is proper under 28 U.S.C. § 1391(e) and LR 3.3(a)(1). Defendant Marten resides within the Missoula Division of the United States District Court for the District of Montana.

### IV. PARTIES

11.   Plaintiff NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana corporation with its principal place of business in Three Forks, Montana. Native Ecosystems Council is dedicated to the conservation of natural resources on public lands in the Northern Rockies.  Its members use and will continue to use the Helena-Lewis and Clark National Forest for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing.  The Forest Service's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the Helena-Lewis and Clark National Forest, including the Project area.  Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

12.   Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt, non-profit

public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems.  Its registered office is located in Missoula, Montana. The Alliance has over 2,000 individual members, many of whom are located in Montana.  Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area in the Helena-Lewis and Clark National Forest. Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems as set forth below.  Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

13.   Defendant LEANNE MARTEN is the Regional Forester for the Northern Region/Region One of the U.S. Forest Service, and in that capacity is charged with ultimate responsibility for ensuring that decisions made at each National Forest in the Northern Region, including the Helena-Lewis and Clark National Forest, are consistent with applicable laws, regulations, and official policies and procedures.

14.   Defendant UNITED STATES FOREST SERVICE (Forest Service) is an

administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the Helena-Lewis and Clark National Forest.

## V.  FACTUAL ALLEGATIONS

15.  The Forest Service produced a Biological Assessment for the Project on August 8, 2016.

16.  The Forest Service received a Biological Opinion for the Project from U.S. Fish and Wildlife Service on August 24, 2016.

17.  The Forest Service signed the Record of Decision authorizing the Project and Forest Plan Amendment #31 on August 25, 2016.

18.  The agency chose to implement a "blended [] alternative" for the Project, which was disclosed in Appendix E to the Project Record of Decision.

19.  Forest Plan Amendment #31 exempts the Project from complying with multiple Forest Plan standards that limit logging and road density in elk habitat, including (1) Forest-wide Big Game Standard 3, which requires retention of hiding cover on elk summer range, (2) Forest-wide Big Game Standard 3, which requires retention of thermal cover on elk winter range, (3) Forest-wide Big Game Standard 4a, which limits open road densities in elk habitat during the big game hunting season depending on the amount of elk hiding cover available, (4) Management Area T-2 standard, which requires

retention of thermal cover on elk winter range, and (5) Management Area T-2 and T-3 standards, which require retention of elk hiding cover in timber harvest openings.

STONEWALL PROJECT AREA & ACTIVITIES

20.    The Project area is on the Lincoln Ranger District of the Helena National Forest, approximately four miles north and west of the town of Lincoln, Montana.

21.    The Project area covers approximately 24,010 acres (approximately 23,670 acres are National Forest System lands) within Lewis and Clark and Powell Counties, Montana.

22.    The Project authorizes management activities on 4,868 acres, including logging on 2,113 acres, prescribed burning on 2,755 acres, 0.9 miles of temporary road building, and road maintenance or reconstruction on 31.5 miles of roads.

23.    The Forest Service estimates that logging will occur over five years, and burning would occur over 10 years.

24.    The Project is "financially inefficient" and will result in a net loss to the Forest Service, and the federal taxpayer, of $972,000.00.

GRIZZLY BEAR

25.    The grizzly bear is listed as a threatened species under the Endangered

Species Act.

26.    Grizzly bears are present on the Helena National Forest.

27.    The Project area is located in the southern portion of the Northern Continental

Divide Ecosystem (NCDE) Grizzly Bear Recovery Zone.

28.    Resident and/or traveling grizzly bears may be present throughout the entire

Project area.

29.    The Montana Department of Fish, Wildlife, and Parks (FWP)  has informed

the Forest Service that the "Blackfoot Travel Plan area," which includes the

Project area, "is exceedingly important to recovering grizzly bear populations

in the southern NCDE."

30.    The Project area is within the Landers Fork Bear Management Unit (BMU)

and includes portions of the Arrastra and Red Mountain BMU sub-units.

31.    The Project area is currently degraded and does not meet the minimum habitat

thresholds necessary for NCDE grizzly bears, known as 19/19/68, which

require no more than 19% of a sub-unit to have open motorized route density

over one mile/square mile, no more than 19% of a sub-unit to have total

motorized route density over one mile/square mile, and no less than 68% core

habitat in a sub-unit.

32.    The U.S. Fish and Wildlife Service (FWS) finds:  "the existing condition of

open and total motorized route density and core do not meet the 19/19/68

Guidelines . . . within the Red Mountain subunit and total motorized route density does not meet the 19/19/68 guidelines within the Arrastra Mountain subunit. The existing, ongoing access condition is likely resulting in adverse effects to grizzly bears."

33. The Project will not improve conditions in the Red Mountain subunit.

34. The Project will temporarily further degrade the condition in the Arrastra subunit during Project implementation by allowing construction and use of 0.9 miles temporary roads, which increases total motorized route density.

35. The Project will not improve conditions in the Arrastra subunit.

36. The Forest Service discloses that "some displacement of bears is expected while treatments are being implemented" for the Project.

37. The Forest Service discloses that "in the short term there will be a reduction in cover and forage, increased potential for displacement of bears and an increased risk of bear/human conflicts" caused by Project implementation.

38. The Project is likely to adversely affect grizzly bears.

39. Forest Plan Standard 3 for Threatened and Endangered Species mandates: "In occupied grizzly habitat, to minimize man-caused mortality the open road density will not exceed the 1980 density of 0.55 miles per square mile, which was determined to have little effect on habitat capability."

40. The draft EIS for the Project does not acknowledge or disclose Forest Plan

Standard 3 for Threatened and Endangered Species.

41. The April 2015 Final EIS (pre-Objection) discloses Forest Plan Standard 3 for Threatened and Endangered Species, but does not provide a calculation of open road density in occupied grizzly bear habitat to demonstrate whether the agency is complying with the standard.

42. However, the April 2015 Final EIS elk analysis discloses an open road density of 3.2 miles/square mile in the Beaver Creek Elk Herd Unit (EHU), and 2.7 miles/square mile in the Keep Cool EHU, with the exception that during hunting season, open road density is 1.4 miles/square mile in the Beaver Creek EHU and 1.3 miles/square mile in the Keep Cool EHU.

43. Additionally, the April 2015 Final EIS lynx analysis discloses an open road density of 2.8 miles/square mile in the Blackfoot-07 (BL-07) Lynx Analyis Unit (LAU) and 1.9 miles/square mile in the Blackfoot-08 (BL-08) LAU.

44. After the NEPA comment period and administrative Objection period had passed for the Project, the Forest Service added a conclusory paragraph on open road density in occupied grizzly habitat to a revised version of the FEIS, which was issued in August 2015.  The added language states:

> Road Density Forest Plan Standard
>
> The Forest Plan standard for open road densities in occupied grizzly habitat is:  "In occupied grizzly habitat, to minimize man-caused mortality the open road density will not exceed the

1980 density of 0.55 miles per square mile, which was determined to have little effect on habitat capability." Under the existing condition the open road density in occupied habitat as defined by the Forest Plan is 0.46 miles per square mile, meeting the Forest Plan standard. For alternatives 2 and 3 there would be a slight increase in open road densities during implementation due to the use of some currently closed roads and roads constructed then obliterated after implementation. As shown below, this would result in open road densities of 0.49 miles per square mile for alternative 2 and 0.48 miles per square mile for alternative 3. Therefore, the Forest Plan Standard would continue to be met for both alternatives 2 and 3 during project implementation. Since this project would not change access management post-implementation, the open road density would revert back to the existing condition of 0.46 miles/square mile upon project completion.

45. The Forest Service also added the following table (Table 105) to the August 2015 revised version of the Final EIS:

Table 105. Forest Plan Occupied Habitat Open Route Densities by Alternative

| FP Standard = < 0.55 mi/mi2 - Occupied habitat = 297 mi2 | | | |
|---|---|---|---|
| Alternative | Miles of Open Route | Change in Open Route Miles from Existing | Open Route Density (mi/mi2) |
| Alternative 1 | 135.4 | N/A | 0.46 |
| Alternative 2 | 145.0 | + 9.6 | 0.49 |
| Alternative 3 | 142.9 | + 7.1 | 0.48 |

46. The August 2015 revised Final EIS provides no explanation as to how the Forest Service calculated the numerator (miles of open roads) or the denominator (occupied habitat in the amount of 297 square miles) for Table 105 in the revised Final EIS.

47.   The Forest Service did not provide an additional public comment or Objection period after it issued the August 2015 revised Project EIS.

48.   In contrast to the unexplained denominator set forth by the Forest Service in the August 2015 revised Final EIS, occupied grizzly bear habitat on the Helena National Forest occurs within the Monture-Landers Fork Bear Management Unit and the Grizzly Bear Distribution Zone within the Blackfoot and Continental Divide Landscape Areas, which collectively cover approximately 593 square miles, not 297 square miles as represented by the agency.

49.   Within occupied grizzly bear habitat on the Helena National Forest, there are 561 miles of open roads.

50.   Therefore, within occupied grizzly bear habitat on the Helena National Forest, open road density is 0.95 miles/square mile.

51.   In Table 105, produced above, the Forest Service states that Project Alternative 2 would increase open road density by 9.6 miles and Alternative 3 would increase open road density by 7.1 miles.

52.   Thus, for the five to 10 years during Project implementation, Alternative 2 would increase open road density in occupied grizzly habitat to 0.96 miles/square miles, and Alternative 3 would increase open road density in occupied grizzly habitat to 0.96 miles/square mile.

LYNX

53.    The Canada lynx is listed as a threatened species under the Endangered

Species Act.

54.    Lynx are present on the Helena National Forest.

55.    The Project area is within lynx Critical Habitat Unit 3

56.    The entire Project area is within designated occupied and core lynx habitat as

well as lynx critical habitat.

57.    The Project area is fully contained within two Lynx Analysis Units: BL-07

and BL-08.

58.    BL-07 is 26,662 acres and has a road density of 2.8 miles/square mile.

59.    BL-08 is 27,549 acres and has a road density of 1.9 miles/square mile.

60.    The Project allows logging on 1,803 acres within BL-07 and 310 acres within

BL-08.

61.    The Project allows burning on 1,318 acres within BL-07 and 1,437 acres

within BL-08.

62.    The Forest Service represents that the Project will regenerate 1,488 acres in

BL-07 and 318 acres in BL-08.

63.    The Forest Service represents that the Project will remove 348 acres of stand

initiation structural stage that currently provides snowshoe hare habitat in BL-

07.

64. The Forest Service represents that the Project will remove 338 acres of multi-storied structural stage that currently provides winter snowshoe hare habitat in BL-07 and will remove 155 acres of multi-storied structural stage that currently provides winter snowshoe hare habitat in BL-08.

65. The Northern Rockies Lynx Management Direction (Lynx Amendment) provides Forest Plan standards and guidelines that apply to projects within "mapped lynx habitat" on National Forests within the Northern Rockies.

66. Lynx Amendment Standard VEG S1 requires: "If more than 30 percent of the lynx habitat in a lynx analysis unit is currently in a stand initiation structural stage that does not yet provide winter snowshoe hare habitat, no additional habitat may be regenerated by vegetation management projects."  However, Lynx Amendment Standard VEG S1 nonetheless allows additional regeneration to occur if the activity occurs within the "wildland urban interface."

67. BL-08 currently has "more than 30 percent . . . in a stand initiation structural stage that does not yet provide winter snowshoe hare habitat."

68. The Project allows logging and/or burning in BL-08 on 318 acres that may regenerate habitat.

69. The Forest Service states that the Project units in BL-08 occur within the wildland urban interface.

13

70.   Lynx Amendment Standard VEG S5 prohibits precommercial thinning in snowshoe hare habitat with certain exceptions.

71.   The Forest Service states that "[a]ll pre-commercial thinning in BL-08 and BL-07 would occur within the wildland urban interface as allowed under the fuel treatment exemptions in the Northern Rockies Lynx Management Direction."

72.   Lynx Amendment Standard VEG S6 prohibits reduction of snowshoe hare habitat in multi-story mature forest.

73.   The Forest Service states that "[a]pproximately 496 acres of multi-storied habitat would be treated within the wildland urban interface, as allowed under the Northern Rockies Lynx Management Direction."

74.   The Forest Service is relying on the wildland urban interface exemption under VEG S5 to allow logging of 379 acres.

75.   The Forest Service is relying on the wildland urban interface exemption under VEG S6 to allow logging of 493 acres.

76.   The Forest Service is relying on the wildland urban interface exemption under VEG S1 to regenerate 318 acres in BL-08.

77.   The Forest Service concedes that the "the Northern Rockies Lynx Management Direction exceptions were applied throughout the entire wildland-urban interface and not limited to the two mile zone of the wildland-

urban interface."

78.     If the wildland urban interface exemption did not apply, the Project would

        violate Lynx Amendment standards VEG S1, VEG S5, and VEG S6.

79.     The Project is likely to adversely affect lynx and lynx critical habitat.

WILDLAND URBAN INTERFACE

80.     The Lynx Amendment and its Biological Opinion/Incidental Take Statement

        allow unrestricted logging in the wildland urban interface, which the agencies

        estimate to compose approximately 6% of the lynx habitat on National

        Forests.

81.     The Lynx Amendment analysis mapped the wildland urban interface under

        several definitions – for both interface and intermix communities – and

        showed its relation to mapped lynx habitat:

        (a)  Blue shading indicates wildland urban interface within one mile of

        areas with 28 people per square mile;

        (b) Red shading indicates wildland urban interface within one mile of

        areas with 100 people per square mile; and

        (c)Green shading indicate wildland urban interface within one mile of

        communities at risk; gray shading indicate mapped lynx habitat.

//

//



82.     The Project units do not all fall within the Lynx Amendment wildland urban

        interface:



83.     The reason that all of the Project units do not fall within the Lynx Amendment

        wildland urban interface is that the Project analysis does not use the Lynx

        Amendment wildland urban inteface map.

84.     Instead of using the Lynx Amendment wildland urban interface map for the

Project analysis, the Project EIS uses a definition and map of wildland urban interface created by local and state government officials in a local wildfire protection plan for Broadwater, Jefferson and Lewis & Clark counties ("tri-county wildland urban interface").

85.   The tri-county wildland urban interface includes all areas up to four miles away from a community.

86.   In reviewing the Project analysis, the Forest Service Regional Office Objection review findings directed the Forest Supervisor to "[p]rovide rationale for using the Tri-County Wildfire Protection Plan WUI as the [Lynx Amendment] exception boundary."  The post-Objection revised Project EIS and Record of Decision do not comply with this mandate.

ELK

87.   Elk are a management indicator species on the Helena National Forest.

88.   The Project area is in Hunting District 281.

89.   Two elk herds use the Project area: Keep Cool Elk Herd and Beaver Creek Elk Herd.

90.   The existing condition for the Keep Cool Elk Herd Unit (EHU) fails to comply with Forest Plan Standard 3 in terms of hiding cover.

91.   Both EHUs also fail to comply with Forest Plan Standard 3 in terms of thermal cover.

92.    Both EHUs also fail to comply with Forest Plan Standard 4a, which requires a combination of a minimal amount of hiding cover and a maximum open road density.

93.    Although neither EHU complies with the Forest Plan, the Project would allow the removal of 3,367 acres of hiding cover in the Beaver Creek EHU and 916 acres of hiding cover in the Keep Cool EHU.

94.    In the Beaver Creek EHU, the Project will reduce hiding cover from 56% to 32%, and in the Keep Cool EHU, the Project will reduce hiding cover from 45% to 29%.

95.    The Project will move these elk herd units further away from consistency with Forest Plan Standard 3 and 4a.

96.    Current open road density in the Beaver Creek EHU during hunting season is 1.4 miles/square mile.

97.    Current open road density in the Beaver Creek EHU outside of the hunting season is 3.2 miles/square mile.

98.    Current road density in the Keep Cool EHU during hunting season is 1.3 miles/square mile.

99.    Current road density in the Keep Cool EHU outside of the hunting season is 2.7 miles/square mile.

100.    The Project will allow the construction of approximately 0.9 miles of

temporary road in the Beaver Creek EHU.

101.   The Project will allow the reopening of an additional 9.6 miles of currently
closed roads to serve as log-hauling routes in the Beaver Creek EHU.

102.   Open road density during Project implementation in the Beaver Creek EHU
during hunting season would increase to 1.7 miles/square mile.

103.   Open road density during Project implementation in the Beaver Creek EHU
outside of hunting season would increase to 3.4 miles/square mile.

104.   The increase in open road density from the Project may last for up to five
years.

105.   The EIS summarizes the quality of elk habitat in Table 121 and 122:

**Table 121. Alternative Elk herd unit summary and Forest Plan compliance**

| Habitat/Plan Compliance | Alternative 1 | | Alternative 2 | | Alternative 3 | |
|---|---|---|---|---|---|---|
| | Beaver Creek | Keep Cool Creek | Beaver Creek | Keep Cool Creek | Beaver Creek | Keep Cool Creek |
| **Elk Hiding Cover** | | | | | | |
| Elk Hiding Cover acres (%) | 18,257 (56) | 15,725 (36) | 15,507 (48) | 14,365 (35) | 16,657 (51) | 15,365 (35) |
| Meets Plan Standard 3 | Yes | No | No | No | No | No |
| **Elk Winter Range Thermal Cover** | | | | | | |
| Winter Range Thermal Cover acres (%) | 938 (5.3) | 527 (3.8) | 583 (3.3) | 527 (3.8) | 664 (3.7) | 527 (3.8) |
| Meet Plan Standard 3 | No | No | No | No | No | No |
| **Open Road Density** | | | | | | |
| Open Road Density mi/mi$^2$ | 1.4 | 1.3 | 1.4[1] (1.7)[2] | 1.3[1] (1.3)[2] | 1.4[1] (1.6)[2] | 1.3[1] (1.3)[2] |
| Percent Hiding Cover | 55 | 36 | 40 | 30 | 43 | 32 |
| Meets Plan Standard 4a | No | No | No | No | No | No |

[1]-Post-implementation road density
[2]-Density during implementation

Table 122. Alternative elk herd unit summary of habitat effectiveness and elk security

| Condition/Compliance with Recommendation | Alternative 1 | | Alternative 2 | | Alternative 3 | |
|---|---|---|---|---|---|---|
| | Beaver Creek | Keep Cool Creek | Beaver Creek | Keep Cool Creek | Beaver Creek | Keep Cool Creek |
| **Habitat Effectiveness** | | | | | | |
| Road Miles | 159.9 | 189.6 | $159.9^{1}$ $(174.2)^{2}$ | $189.6^{1}$ $(189.6)^{2}$ | $159.9^{1}$ $(174.2)^{2}$ | $189.6^{1}$ $(189.6)^{2}$ |
| Square Miles | 50.6 | 69.3 | 50.6 | 69.3 | 50.6 | 69.3 |
| Open Road Density in $mi/mi^{2}$ | 3.2 | 2.7 | $3.2^{1}$ $(3.4)^{2}$ | $2.7^{1}$ $(2.7)^{2}$ | $3.2^{1}$ $(3.4)^{2}$ | $2.7^{1}$ $(2.7)^{2}$ |
| Habitat Effectiveness | 37 | 41 | $37^{1}$ $(35)^{2}$ | $41^{1}$ $(41)^{2}$ | $37^{1}$ $(35)^{2}$ | $41^{1}$ $(41)^{2}$ |
| Meets 50 percent Recommendation | No | No | $No^{1}$ $(No)^{2}$ | $No^{1}$ $(No)^{2}$ | $No^{1}$ $(No)^{2}$ | $No^{1}$ $(No)^{2}$ |
| **Hunting Season Elk Security** | | | | | | |
| Security Habitat Post Implementation acres (%) | 8,493 (26) | 11,828 (27) | 8,493 (26) | 11,828 (27) | 8,493 (26) | 11,828 (27) |
| Meets 30 percent recommendation (Hillis et al.1991) | No | No | No | No | No | No |
| Security Habitat During Implementation (%) | | | 6,449 (20) | 11,169 (25) | 7,124 (22) | 11,385 (26) |
| Meets 30 percent recommendation | No | No | No | No | No | No |

[1]-Post implementation
[2]-During implementation

106.   Thus, Tables 121 and 122 demonstrate the following findings:

(a) The Project does not meet Forest Plan Standard 3 for Hiding Cover;

(b) The Project does not meet Forest Plan Standard 3 for Thermal Cover;

(c) The Project does not meet Forest Plan Standard 4a for open road density and hiding cover;

(d) The Project does not meet the 50 percent recommendation for Habitat Effectiveness; and

(e) The Project does not meet the 30 percent recommendation (Hillis et al 1991) for Security Habitat.

107.   Despite the failing condition of the Project area – which will be further

degraded by the Project – for both action alternatives for the Project, the EIS concludes: "Conclusions and Determination . . . Hunting opportunities would be maintained and based on the analysis presented above and the following rationale, adequate elk habitat would continue to be available within both units to support desired levels of elk."

108.  The EIS further states: "elk security and walk-in hunting opportunity objectives identified for this EMU (MFWP 2005) would be maintained."

109.  The EIS further states:  "Elk habitat would continue to be abundant and well-distributed and species' viability would be maintained across the Forest."

110.   The EIS further represents: "Of the primary [Montana Fish, Wildlife, and Parks] population parameters likely to be impacted by elk security habitat on the Helena National Forest (namely, total population numbers and bull/cow ratios), total numbers on average have met Montana Elk Plan objectives for the past several years. The project would make no changes that would influence this."

111.  The EIS further represents:  "[w]hile many factors contribute to elk numbers, exempting the project from Standards 3 and 4a, and hiding cover and thermal cover standards for management areas T-2 and T-3, should not preclude the ability of Montana Department of Fish, Wildlife, and Parks to realize its elk

objectives in this hunting district."

112.   Forest Plan Standard 6 mandates that "Montana Cooperative Elk-Logging

Study Recommendations, in [Forest Plan] Appendix C, will be followed

during timber sale and road construction projects."

113.   In its "Road Management Recommendation," the Montana Cooperative Elk-

Logging Study states: "Where maintenance of elk habitat quality and security

is an important consideration, open road densities should be held to a low

level and every open road should be carefully evaluated to determine the

possible consequences for elk."

114.   In the Project EIS, the Forest Service argues that it is complying with this

"Road Management Recommendation" from the Montana Cooperative Elk-

Logging Study:  "Road management – This recommendation is also intended

to maintain elk security through management of road densities.

Implementation of Alternatives 2 and 3 would result in a short-term (5 years

or less) increase in road density during implementation. New roads would not

be opened to the public. Elk security would be maintained over the long-term

and both alternatives are consistent with this recommendation."

115.   In its response to the administrative Objection to the Project and Forest Plan

Amendment, the Forest Service Regional Office stated that the "best

available science for big game security" is the "Blackfoot methodology" as

set forth in the "proposed programmatic forest plan standard defined in the

Blackfoot non-Winter Travel Plan EIS."

116.  The Blackfoot methodology applies the Hillis elk security concept, with

modifications so that a 50% minimum of elk security is required, and the

percentage is calculated with a denominator equivalent to the proportion of an

Elk Herd Unit within the boundary of the Lincoln Ranger District.

Additionally, security blocks must be at least 1,000 acres in size and at least

0.5 miles from a motorized route open to the public between September 1 and

December 1 (archery and rifle hunting season), and blocks do not include any

constrictions less than ½ mile in width.

117.  The Hillis elk security concept was modified for the Blackfoot area because,

as FWP has explained, "[a]lthough the [Hillis] authors recommended that, on

their study area, secure patches be a minimum of 250 acres in size and

comprise at least 30% of a herd unit's fall home range, they were clear that

where forests are more sparse and where terrain is less formidable (as in the

[Lincoln Ranger District]), the size of security areas must be significantly

larger in order to provide similar security to resident elk."

118.  FWP further informed the Forest Service that "security area patch size (250

acres) and percent retention (30% of an elk analysis unit)" in the Lincoln

Ranger District is not "supported by either the literature or the [Helena

National Forest]'s own analysis."

119.  The revised version of the Project EIS, issued in August 2015, indicates that under the Blackfoot methodology, the Project area has only 41% elk security in the Beaver Creek Elk Analysis Unit and 36% elk security in the Keep Cool Elk Analysis Unit, which both fail the 50% recommendation.

FWP FINDINGS - ELK SECURITY ON THE LINCOLN RANGER DISTRICT

120.  In its May 27, 2014 Objection to the proposed Blackfoot Travel Plan and Travel Plan Forest Plan Amendment, FWP stated: "MFWP's mission is broad, but our objection (in this letter) is centered on a specific value for which Montana relies on the [Helena National Forest]: the continued provision of elk (and other wildlife) hunting opportunities on public lands for present and future generations. We further suggest that this value helps set the [Helena National Forest] apart from many other forests in the National Forest System, with regard to the multiple uses that we offer on our public lands in Montana. . . . The [Helena National Forest] is a destination for elk hunting in the US, the foundation for which is the amount and quality of habitat, security and access afforded on our public lands."

121.  FWP further stated:  "Recently, the [Helena National Forest] has worked in partnership with other East-Side Forests in Montana, MFWP, and the National Forest Northern Region Office to update elk security guidance,

reflecting the best available science and professional expertise.  However, despite these efforts, the Big Game Security D[raft] ROD [for a Forest Plan Amendment] coupled with the [Travel Plan] FEIS's preferred Alternative 4 would actually decrease elk security on the  [Helena National Forest] compared to alternatives presented in the D[raft] EIS, and would cumulatively risk elk populations and the hunting tradition on public land."

122.   FWP further stated:  "MFWP objects to the proposed decision to adopt the big game security Forest Plan amendment alternative B (preferred alternative). This amendment provides for and protects inadequate big game security in several Lincoln Ranger District (LRD) Elk Analysis Units--if it were to be implemented in conjunction with the FEIS's Preferred Travel Plan Alternative 4."

123.   In response to the Forest Supervisor's statement that Travel Plan Alternative 4 achieves a purpose and need to "[m]ore closely align current science, local conditions, and other information with elk security needs that meet the intent of the Forest Plan; [and] ensure Helena Forest Plan (USDA Forest Service 1986, as amended) management direction applicable to big game security is up-todate and based on the best available information," FWP stated, "MFWP disagrees with this statement. We object to its use as a rationale for adopting either the proposed new big game security standard (amendment alternative

B) or the Blackfoot Travel Plan FEIS Preferred Alternative 4. . . . Adoption of Amendment B in conjunction with FEIS Alternative 4 would fail to provide or protect adequate big game security within much of the [Lincoln Ranger District]."

124. FWP further stated: "the Big Game Security Amendment [draft] ROD, implies or cites[] that the total number of elk documented by MFWP biologists within hunting districts that include the Lincoln Ranger District lands is a correct measure of whether or not adequate secure big game habitat is available on Forest Service lands. This is inappropriate because the correct measures of big game security are annual bull survival rates and the degree to which big game are retained on public land during the fall hunting season."

125. FWP further stated: "MFWP supports the concept that, on the [Lincoln Ranger District], providing adequately large, properly configured, well distributed, and numerous patches of non-motorized secure fall habitat within the [Lincoln Ranger District]'s Elk Analysis Units (EAUs) would ensure annual bull survival objectives are met and would reduce the likelihood of public elk leaving public lands during the fall hunting season. While it is true that MFWP biologists collaborated closely with USFS biologists (and, in fact, provided the data, analysis, and professional opinion that formed the basis of big game security Amendment Alternative B), MFWP's recommendations

were explicitly predicated and dependent upon the adoption of a Travel Plan closely aligned with FEIS Alternative 3. In some EAUs, Big Game Security Amendment alternative B will not provide or protect adequate fall big game security if the Preferred Travel Plan Alternative 4 were to be adopted."

126. In previous comments to the Forest Service, FWP had found: "Although elk populations have generally increased in hunting districts that include Helena National Forest land since adoption of the 1986 HNF Forest Plan, the number of elk that spend summer and fall on the Lincoln Ranger District (LRD) have not. . . . Bull survival is low relative to FWP objectives in 3 of the 4 elk hunting districts that include the Lincoln Ranger District; the one exception being hunting district (HD) 339 where special regulations specifically limit bull harvest opportunity. FWP recommends that land managers provide enough secure habitat during fall to meet annual bull survival objectives while maintaining general bull harvest opportunity. . . . Neither public land populations nor bull ratios in the Lincoln valley have increased despite the near elimination of antlerless harvest opportunity and the adoption of spike-bull harvest restrictions. In contrast, the number of elk that spend the majority of the year on some nearby private lands has increased dramatically between 1986 and 2013. FWP has consistently urged the HNF to increase functional fall habitat security on the Lincoln Ranger District during the more than 5

years we have participated in the non-winter Travel Plan amendment process. Alternative 3 in the Blackfoot Non-winter Travel Plan DEIS (hereafter, Alternative 3) fairly represents FWP 's recommendations."

127. FWP also reminded the Forest Service: "FWP biologists consistently argued that fall motorized-route density was too high in certain portions of the [Lincoln Ranger District] and that specific routes and motorized-use areas unacceptably compromised elk habitat security."

128. Further, FWP had informed the Forest Service that "Although total elk numbers are currently within objective in HD 281 (not 'above', as stated in the DEIS), bull survival (a 3- year average of 9 bulls: 100 cows observed in spring) has consistently been well below the objective of 15 bulls: 100 cows described in the Montana Final Elk Management Plan (MFWP 2004)."

129. FWP further stated: "Within the Travel Plan FEIS and Big Game Security Amendment [draft] ROD, the analysis of overall elk population trend mischaracterizes the specific purposes of providing secure big game fall habitat. In reality, these purposes should be to: 1) increase bull elk survival, and 2) prevent the displacement of elk from public lands during fall hunting seasons."

130. FWP stated: "The objective of a big game security standard is to ensure that adequate and well-distributed secure big game habitat is retained within

[Lincoln Ranger District] EAUs. The correct measure of the standard's adequacy is not elk population counts or trend within MFWP hunting districts or FS Elk Analysis Units []. Instead, provision of adequate and well-distributed secure public-land habitat is intended both to protect a defined proportion of bulls from harvest and to prevent the displacement of public elk from public lands during the fall hunting season."

131.    FWP explained: "In managed landscapes, open motorized route density and arrangement during the fall hunting season most strongly affects bull survival. Inadequate secure public land habitat may also cause elk to increase use of nearby private lands that provide only little or no public hunting opportunity."

132.    Thus, FWP stated that "implementation of [Travel Plan] Alternative 3 would increase bull survival on the Travel Plan area and help affected herds achieve or maintain FWP bull-ratio objectives going forward."

133.    FWP explained: "Within the Travel Plan FEIS, the use of 'Elk Herd Unit' and 'Elk Analysis Unit' (or just, 'Analysis Unit') are incorrectly treated as equivalent; they are not. . . . The incorrect use of these terms in the FEIS led to mistaken conclusions in the Big Game Security Amendment [draft] ROD that proposed Amendment B would adequately provide and protect fall big game security habitat under any of the analyzed Travel Plan alternatives. MFWP worked with USFS biologists to define discrete year-round Elk Herd

Unit boundaries that, in most cases, included both USFS and adjacent private lands. During later collaborative work to assist the USFS in developing an amended Big Game Security standard, MFWP recommended use of the concept of the Elk Analysis Unit, defined as 'that portion of an Elk Herd Unit within the Forest Service administrative boundary,' because we recognized that USFS planners could neither regulate nor control elk habitat management outside the National Forest administrative boundary and that private lands outside the administrative boundary are generally insecure. This is an important distinction because the authors of the 'Hillis Paradigm' (Hillis et al. 1991) stress that 'to be biologically meaningful, analysis unit boundaries should be defined . . . specifically by the local herd home range during hunting season' and should not be adjusted for land ownership. Because significant portions of several [Lincoln Ranger District] Elk Herd Units are privately managed, and likely insecure, MFWP biologists recommended that more than the minimum proportion of Elk Analysis Units (within the administrative boundary) be managed as big game security habitat in order to meet overall elk habitat requirements.  In the DEIS Draft Big Game Security Amendment, the [Helena National Forest] proposed that 30% of an entire Elk Herd Unit be maintained as secure habitat, which followed both the Hillis Paradigm and the MFWP/USFS joint Working Group recommendations.

30

However, the FEIS Big Game Security Amendment B measures elk security at the Elk Analysis Unit level. The USFS analysis in Appendix F (p. 174) therefore incorrectly implies that there would be an increase in the 'desired minimum threshold' or 'Goal' from 30% to 50% secure habitat because the denominator of the ratio is entirely different for each calculation. The 50% standard applied in the Preferred Alternative B refers to that portion of an Elk Herd Unit within the FS boundary, a.k.a., the Elk Analysis Unit, while the 30% threshold was tied to the entire Elk Herd Unit, as above."

134.    FWP stated: "MFWP biologists and managers worked with the [Helena National Forest] to develop Big Game Security Amendment Alternative B, to replace existing Forest Plan Standard 4(a)."

135.    FWP informed the Forest Service: "Changing the big game security standard to come into compliance is not sufficient in and of itself; the standard must adequately conserve secure habitat."

SITE-SPECIFIC PROJECT FOREST PLAN AMENDMENT

136.    The Project includes a Project-specific Forest Plan amendment to exempt the Project from the following Forest Plan requirements: (1) Forest-wide Standard 3 for hiding cover on summer range for the Beaver Creek and Keep Cool Creek EHUs and thermal cover on winter range in the Beaver Creek EHU; (2) Forest-wide Standard 4a for open road densities during the big

game hunting season for the Beaver Creek and Keep Cool Creek EHUs; (3) Management Area T-2 standard for thermal cover on winter range; and (4) Management Area T-2 and T-3 standards for hiding cover in timber harvest openings.

137.  The Forest Service stated: "This amendment is being completed under the requirements of the 1982 [NFMA] regulations."

138.  The 1982 NFMA regulations state:

> Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

> (a) Each alternative shall establish objectives for the maintenance and improvement of habitat for management indicator species selected under paragraph (g)(1) of this section, to the degree consistent with overall multiple use objectives of the alternative. To meet this goal, management planning for the fish and wildlife resource shall meet the requirements set forth in paragraphs (a)(1) through (a)(7) of this section.

> (1) . . . On the basis of available scientific information, the interdisciplinary team shall estimate the effects of changes in . . .year-long suitability of habitat related to mobility of management indicator species. Where appropriate, measures to mitigate adverse effects shall be prescribed.

(2) Planning alternatives shall be stated and evaluated in terms of both amount and quality of habitat and of animal population trends of the management indicator species.

(3) Biologists from State fish and wildlife agencies and other Federal agencies shall be consulted in order to coordinate planning for fish and wildlife, including opportunities for the reintroduction of extirpated species.

(4) Access and dispersal problems of hunting, fishing, and other visitor uses shall be considered.

. . . .

## VII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

<u>The Project and Project EIS analysis of elk and elk habitat</u>

<u>violate NEPA, NFMA, and APA.</u>

139.   All previous paragraphs are incorporated by reference.

140.   The Forest Service's conclusion in the Project EIS that it is conserving adequate and "well-distributed" habitat for elk is arbitrary and capricious.

141.   The EIS indicates that the Project area fails every quantitative metric used to determine whether elk habitat is well-distributed and adequate: (1) Forest Plan Standard 3-Hiding Cover, (2) Forest Plan Standard 3 - Thermal Cover, (3) Forest Plan Standard 4a - Open Road Density & Hiding Cover, (4) Habitat Effectiveness, (5) Hillis Elk Security at Elk Herd Unit level (i.e., including all lands), and (6) Hillis-derived Elk Security at Elk Analysis Unit

level (i.e., lands within National Forest boundary).

142. In violation of NEPA, the EIS misrepresents or fails to accurately disclose the findings of FWP regarding elk security and elk objectives in the Hunting District affected by the Project.

143. For example, the EIS misrepresents the status of the most important elk objective in HD 281 - bull/cow ratio. The EIS represents that on average, the objective for bull/cow ratio in HD 281 has been met for the past several years.  To the contrary, FWP has informed the Forest Service that the bull/cow ratio for HD 281 is "consistently well below the objective."

144. Additionally, the EIS incorrectly implies or represents that elk population numbers are appropriate indicators for the adequacy of elk habitat.  FWP has informed the Forest Service that total number of elk is not a correct measure of whether or not adequate secure big game habitat is available on Forest Service lands: "This is inappropriate because the correct measures of big game security are annual bull survival rates and the degree to which big game are retained on public land during the fall hunting season."

145. Furthermore, the EIS does not adequately disclose or address the displacement of elk from public land to private land during hunting season due to inadequate security habitat on National Forests.  FWP has informed the Forest Service that "[a]lthough elk populations have generally increased

in hunting districts that include Helena National Forest land since adoption of the 1986 [Helena National Forest] Forest Plan, the number of elk that spend summer and fall on the Lincoln Ranger District (LRD) have not. . . .  FWP recommends that land managers provide enough secure habitat during fall to meet annual bull survival objectives while maintaining general bull harvest opportunity. . . . Neither public land populations nor bull ratios in the Lincoln valley have increased despite the near elimination of antlerless harvest opportunity and the adoption of spike-bull harvest restrictions.  In contrast, the number of elk that spend the majority of the year on some nearby private lands has increased dramatically between 1986 and 2013.  FWP has consistently urged the [Helena National Forest] to increase functional fall habitat security on the Lincoln Ranger District . . . ."

146.  In violation of NFMA and NEPA, the Forest Service has not demonstrated compliance with the Montana Elk-Logging Study Recommendation for Road Management as required by the Forest Plan.  The Road Management requirement states:  "Where maintenance of elk habitat quality and security is an important consideration, open road densities should be held to a low level, and every open road should be carefully evaluated to determine the possible consequences for elk."

147.  The Forest Service has failed to demonstrate compliance with the requirement

to hold open road densities to a low level.  To the contrary, the EIS

demonstrates that the Project area fails every quantitative metric of what

constitutes low open road density: (1) Forest Plan Standard 4a, (2) the 50%

Habitat Effectiveness threshold, (3) the 30% Hillis elk security threshold for

entire Elk Herd Units, and (4) the 50% Hillis-derived elk security threshold

for Elk Analysis Units (i.e., the portion of an Elk Herd Unit that falls within a

National Forest boundary).  Moreover, the Montana Elk-Logging Study states

that "open road densities are low" if there is "less than 0.5 mile of road per

square mile."  The Project fails to meet this definition of low open road

density as well.

148.   For the above-stated reasons, the Project and the Project EIS violate NEPA,

NFMA, and the APA.

## SECOND CLAIM FOR RELIEF

The site-specific Forest Plan Amendment issued with the Project does not analyze a

reasonable range of alternatives or apply the available science to ensure well-

distributed elk habitat in violation of NFMA, NEPA, and the APA.

149.   All previous paragraphs are incorporated by reference.

150.   A Record of Decision may only be issued after completion of an EIS.

151.   An EIS must include an analysis of reasonable alternatives.

152.   Thus, a Forest Plan Amendment that is authorized in a Record of Decision

and analyzed in an EIS must include an analysis of reasonable alternatives for the Forest Plan Amendment.

153.    The Forest Service chose to apply the 1982 NFMA regulations to the Forest Plan Amendment that was issued with the Project.

154.    In order to ensure viability, the 1982 regulations require that the Forest Service ensure that wildlife habitat is well-distributed throughout a planning area.

155.    The 1982 regulations require the Forest Service to assess the suitability of habitat for management indicators species on "the basis of available scientific information."

156.    The 1982 regulations require the Forest Service to state and evaluate forest planning alternatives "in terms of both amount and quality of habitat and of animal population trends of the management indicator species."

157.    The 1982 regulations require the Forest Service to consult with biologists from "State fish and wildlife agencies" to coordinate planning for fish and wildlife.

158.    The 1982 regulations require the the Forest Service to consider "[a]ccess and disperal problems of hunting . . . ."

159.    In this case, the Forest Service failed to analyze any alternatives for the Forest Plan Amendment, even though it chose to document its decision in a

ROD and EIS.

160.  A reasonable alternative for the Forest Plan Amendment would be an alternative that complies with the 1982 planning regulation by using current science and consultation with State biologists to (a) ensure well-distributed habitat for elk throughout the planning area, and (b) address access and dispersal problems during the hunting season.

161.  The Forest Service's failure to analyze a reasonable range of alternatives for the Forest Plan Amendment, and failure to demonstrate compliance with the 1982 planning regulation requirements, violate NEPA and NFMA.

THIRD CLAIM FOR RELIEF

The Forest Service failed to demonstrate compliance with the Forest Plan grizzly bear open road density standard in the Project EIS in violation of NEPA, NFMA, and the APA.

162.  All previous paragraphs are incorporated by reference.

163.  The Forest Plan contains a standard that prohibits open road density over 0.55 miles/square mile in occupied grizzly bear habitat.

164.  The draft EIS for the Project did not acknowledge the standard that prohibits open road density over 0.55 miles/square mile in occupied grizzly bear habitat.

165.  The April 2015 Final EIS (pre-Objection) disclosed the standard that

prohibits open road density over 0.55 miles/square mile in occupied grizzly bear habitat, but did not provide a calculation of open road density in occupied grizzly bear habitat to demonstrate whether the agency is complying with the standard.

166. The April 2015 Final EIS elk analysis disclosed an open road density of 3.2 miles/square mile in the Beaver Creek EHU and 2.7 miles/square mile in the Keep Cool EHU, with the exception that during hunting season, open road density is 1.4 miles/square mile in the Beaver Creek EHU and 1.3 miles/square mile in the Keep Cool EHU.  This open road density does not comply with a 0.55 miles/square mile standard at any time of year.

167. The April 2015 Final EIS lynx analysis disclosed an open road density of 2.8 miles/square mile in the BL-07 Lynx Analyis Unit and 1.9 miles/square mile in the BL-08 Lynx Analysis Unit.  This open road density does not comply with a 0.55 miles/square mile standard.

168. After the comment and Objection periods had passed, the Forest Service added a conclusory paragraph on open road density in occupied grizzly habitat to a revised version of the FEIS, which was issued in August 2015. The conclusory paragraph provides an open road density estimate of 0.46 miles/square mile.  This estimate was not disclosed in the draft EIS or April 2015 final EIS, and there is no supporting analysis to explain the basis for the

calculation or the discrepancy between the new calculation and the other estimates of open road density previously provided in the draft EIS and April 2015 final EIS.  The conclusory paragraph does not provide the public with enough information to determine whether the agency is actually complying with the Forest Plan: it is unclear which lands were included or excluded in the denominator, and how they were chosen for inclusion or exclusion; it is also unclear which roads were included or excluded in the numerator, and how they were chosen for inclusion or exclusion. The missing analysis is significant because it appears that the number is not correct:  according to prior government disclosures, it appear that within occupied grizzly bear habitat on the Helena National Forest, open road density is actually 0.95 miles/square mile, which fails the standard in violation of NFMA.

169. The Forest Service's failure in the Project EIS to adequately demonstrate compliance with its Forest Plan standard that prohibits open road density over 0.55 mile/square mile in occupied grizzly bear habitat violates NFMA and NEPA.  Additionally, the Forest Service's decision to wait until after the public comment and administrative review phases were complete before providing critical information on Forest Plan compliance violates NEPA.

FOURTH CLAIM FOR RELIEF

The Project does not comply with the Lynx Amendment because the agency relied

on exemptions that apply only to wildland urban interface areas, but the entire

Project is not located within a wildland urban interface as defined by the Lynx

Amendment.

170.   All previous paragraphs are incorporated by reference.

171.   The Lynx Amendment provides an exemption from its logging and burning

restrictions for areas that are within a wildland urban interface area.

172.   In order to determine the effects of the wildland urban interface exemption on

lynx, during NEPA and ESA analysis on the Lynx Amendment, the Forest

Service mapped lynx habitat and wildland urban interface areas (using three

different definitions) in that mapped lynx habitat.  Based on this analysis,

which determined that 6% of mapped lynx habitat fell within a wildland urban

interface area, the agency found that the wildland urban interface exemption

would likely have adverse effects on lynx and it received a biological opinion

and incidental take statement from FWS.

173.   For the Project, the Forest Service did not use the Lynx Amendment

definition and map to determine the boundaries of the wildland urban

interface.

174.   Instead of using the Lynx Amendment wildland urban interface map and

definition, for the Project, the Forest Service used the definition and map of

wildland urban interface created by several local city and county

governments, fire departments, and the Montana Department of Natural Resource Conservation in a regional "Community Wildfire Protection Plan" for Lewis & Clark, Jefferson, and Broadwater Counties ("tri-county wildland urban interface").

175. The tri-county wildand urban inteface is inconsistent with the Lynx Amendment wildland urban inteface: the tri-county wildland urban interface extends up to four miles away from communities, whereas the Lynx Amendment wildland urban interface is defined as an area within one mile of communities.

176. By using the tri-county wildland urban interface for the Project analysis, the Forest Service now claims that all Project logging units, and most Project burning units, fall within the wildland urban interface and are therefore exempt from the logging and burning restrictions set forth in the Lynx Amendment.

177. Under the Lynx Amendment definition of wildland urban interface, however, all of the logging and burning units do not fall within the wildland urban interface. The Forest Service's failure to comply with logging and burning restrictions in areas outside the wildland urban interface violates NFMA. The Forest Service's failure to adequately address this issue in the EIS and demonstrate compliance with the Lynx Amendment also violates NEPA.

## VIII.  RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the

following relief:

A.    Declare that the Project and/or Forest Plan Amendment violate the law;

B.    Enjoin implementation of the Project;

C.    Award Plaintiffs their costs, expenses, expert witness fees, and reasonable

attorney fees under EAJA; and

D.    Grant Plaintiffs any such further relief as may be just, proper, and equitable.


Respectfully submitted this 17th Day of February, 2017.


*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Kristine Akland
AKLAND LAW FIRM PLLC

Attorneys for Plaintiffs